SHIRLEY D. DEUTSCH, Bar No. 76230
SCHWARTZ & DEUTSCH, LLP
333 South Hope Street, 35th Floor
Los Angeles, California 90071
Tel: (213) 236-9400
Fax: (213) 236-9499
Email: sdeutsch@earthlink.net

Betty Thorne Tierney, pro hac vice
MACY'S LAW DEPARTMENT
111 Boulder Industrial Court, 2nd Floor
St. Louis, MO  63044
Telephone: (314) 342-6728
Facsimile: (314) 342-6366
Email:  betty.tierney@macys.com

Attorneys for Defendants
MACY'S WEST STORES, INC.,
MACY'S CORPORATE SERVICES, INC.
and MACY'S RETAIL HOLDINGS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOURVASH DEZHAM,<br><br>        Plaintiff,<br><br>v.<br><br>MACY'S WEST STORES INC., et al.,<br><br>        Defendants. | CASE NO.: SACV 13-1864-DOC (RNBx)<br><br>**DEFENDANT MACY'S WEST STORES, INC.'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

Defendant Macy's West Stores, Inc., pursuant to Local Rule 56-1, submits the following Statement of Uncontroverted Facts and Conclusions of Law in Support of Its Motion For Summary Judgment or, in the Alternative, Partial Summary Judgment.

**General Facts Related To Macy's Policies**

1.      Macy's has a promulgated policy that prohibits discrimination against any protected characteristic including age, disability, nation origin, race, religion gender and a myriad of other characteristics protected by law. Declaration of Roberta Eagle ("Eagle Dec."), paragraph 4 and Exhibit A attached thereto.

2.      Employees are trained on this policy during their new hire orientation and at least every two years after that. Sometimes employees are trained more frequently on this policy. Deposition of Elizabeth Villela ("Villela Dep.), p. 24:3-14; Eagle Dec., ¶5.

3.      Employees who believe they are being subjected to discrimination have several reporting options. First, they can go to their manager or any other manager in the store to lodge their concerns. The store human resources manager or the store manager are also available options. If for some reason the employee is hesitant to report the issue to anyone in the store, the company has an internal dispute resolution process called Solutions InSTORE ("SIS") and all employees are given the number to call to report concerns or issues for investigation and resolution. The SIS number is also posted in areas frequented by employees including the employees' bulletin boards and lounge areas. Macy's also has a global compliance hotline that employees can utilize at any time if they have concerns or complaints. This information is available in the human resources office and the employee handbook that is available in hard copy in the human resources office and is also available to employees online. Eagle Dec., ¶6.

4.      Macy's leave of absence policy is more generous than the FMLA. Macy's generally grants an employee a minimum of 26 weeks of leave. If the employee needs additional time as an ADA accommodation, Macy's will review medical documentation to determine whether such an extension is reasonable and necessary. Declaration of Reva Sherman ("Sherman Dec."), ¶5.

5.      Macy's does not grant employees indefinite leaves of absence. The primary

1  requirement for extending a leave of absence is that the employee's doctor certify that
2  extending the leave will assist the employee in returning to work in the foreseeable
3  future.  Sherman Dec., ¶7.

4      6.    Employees who are let go because they cannot return from a leave of
5  absence and/or are on an indefinite leave are eligible for rehire at Macy's.  However, this
6  does not mean that they are subject to special treatment in the hiring process.  They must
7  re-apply and go through the interview process.  They, of course, will be competing with
8  other candidates who may be as or more qualified.  Nevertheless, such employees are
9  eligible for rehire and are welcome to re-apply after they have been released to work.
10  Sherman Dec., ¶7.

11      7.    Macy's has three groups that may work with injured employees.  If the
12  injury occurs at the workplace, the workers' compensation group will be involved.  This
13  process starts with the filing of a workers compensation injury form.  The second group
14  that may be involved is the Leave of Absence ("LOA") team at HR Services in
15  Clearwater, Florida.  If an injured or sick employee requires a leave of absence, the LOA
16  team at HR Services communicates directly with the employee to ensure the proper
17  documentation is submitted.  If a doctor suggests an employee is able to return to work
18  from a leave of absence, that information is conveyed to the Return to Work team, which
19  is part of the workers' compensation group.  If the employee requires a special
20  accommodation to return to work – specifically including the purchase of special tools or
21  equipment to aid the employee, the Accommodation Disability and Leave Management
22  group ("ADLM") is involved.  Sherman Dec., ¶8, 9, 10 and 13.

23  **Hourvash Dezham**

24      8.    Hourvash Dezham began working for Macy's in August 1997.  Deposition
25  of Hourvash Dezham ("Dezham Dep."), p. 22:15-21.

26      9.    Dezham eventually began working in lingerie at the Valley Fair store and

27

later moved to the South Coast Plaza store.  She remained in the lingerie department until her employment ended.  Dezham was a good sales associate.  Dezham Dep., pp. 30:16-31:7; 32:13-36:18; Villela Dep., pp. 40:24-41:3; Deposition of Judy Wilson ("Wilson Dep."), pp. 22:23-23:19.

10.     The essential duties of a selling associate include that the employee be mobile and able to move around the department to stock merchandise, assist customers and ensure that the selling area remains neat and orderly.  Eagle Dec., ¶7, and Ex. B attached thereto.

11.     An additional essential duty of a sales associate is that they are required to meet the department selling goals each day.  Each department has a sales goal for the day. That sales goal is divided among the scheduled associates based on the number of hours that they are schedule to work and the shift they are working (some hours of the day have higher sales potential base on company experience).  Deposition of Roberta Eagle ("Eagle Dep."), pp. 31:23-32:4; 72:21-74:7; 82:13-22; Eagle Dec., ¶8.

12.     An additional essential duty of a sales associate is that they are required to open credit accounts for their time on the floor.  Sales associates are also evaluated based on their customer service skills.  A sale's associate's success depends upon how well they perform all the essential functions.  Eagle Dec., ¶8-9.

**Dezham's Injury**

13.     Dezham was injured in July 2010 when she attempted to push the contents of a trash can down and ended up falling.  Dezham Dep., pp. 105:11-106:21.

14.     Dezham alleges that she broke her toe and injured her back in the incident. Dezham Dep., pp. 105:11-106:21.

15.     Macy's filed a workers' compensation claim on her behalf.  Dezham Dep., pp. 113:4-114:11.

16.     Dezham's physician requested that she be placed on a leave of absence immediately after injuring her foot/toe, and Macy's approved the leave. Dezham Dep. pp. 116: 11-21; 122:12-123:12, and Exhibit 3 attached thereto; 125:13-15.

17.     Dezham was on leave from approximately July 14, 2010 until August 25, 2010. Dezham Dep., pp. 116: 11-21; 122:12-123:6, and Exhibit 3 attached thereto.

**Modified Duty**

18.     In August 2010, Dezham's physician determined that she was able to work a modified/light duty assignment. She returned to a modified position at Macy's at the end of August 2010. Her restrictions at that time were that she could not do seated work, she could not climb and she had to be allowed to use cane/cam walker as needed. Dezham Dep., pp. 125:16-126:10; 129:6-10; 129:12-131: 10, and Exhibit 4 attached thereto; Eagle Dep. pp. 25:22-26:20; Eagle Dec., ¶10 and Ex. C attached thereto.

19.     Macy's policy at that time allowed an employee to be placed on a light duty assignment for 90 days. In those instances, the employee was not placed in a new position but was simply given a temporary position created for the 90 day limited time period. The jobs were usually created by combining assignments from other jobs or just allowing the employee to do the portions of a regular position that her restrictions would allow her to perform. Dezham Dep. pp. 133: 19-134:13; Eagle Dep. p. 86:12-16; Eagle Dec., ¶11; Sherman Dec., ¶11.

20.     Examples of light/modified duty include working a credit table. Such a position would be created for the injured employee who needed to work in a sitting position. This type of job was not available in general but only used for the 90 day modified duty. Other examples of modified duty include folding dress shirts, repackaging dress shirts, hanging lingerie and hanging fitting room items. Deposition of Shawn Fahey ("Fahey Dep."), pp. 103:7-104:3; Eagle Dep. p. 139:17-23; Sherman Dec., ¶12.

1    21.    As an accommodation, in late August 2010 Macy's assigned Dezham to
2 perform light/modified duty in the Administrative Support Team (hereinafter "AST")
3 department which would meet her restrictions of sitting for most of the shift but would
4 also allow her flexibility to stand and walk when able as well.  Dezham Dep., pp. 136:19-
5 142:7; Fahey Dep., p. 13:12-15; Eagle Dep., pp. 30:13-31:13.

6    22.    Dezham was not coded as an AST associate – she was simply placed in the
7 executive office to do clerical work until her health improved and she was able to return
8 to her previous position or until the company could find another position that met her
9 restrictions.  This assignment was to last no more than 90 days, pursuant to Macy's
10 policy.  Fahey Dep., p. 13:12-15; Eagle Dep., pp. 30:13-31:13; Eagle Dec. ¶12, and Ex.
11 D; Dezham Dep., pp. 136:19-142:7;

12    23.    The AST position was new to the Macy's stores in 2009.  Fahey Dep. p.
13 28:8-24.

14    24.    Dezham's role in the AST office was similar to that of a temporary
15 employee.  She was not given the same access as a regular AST associate as she was not
16 doing all the same tasks, and was not an AST employee.  The AST office has had other
17 injured employees who performed modified duty in the AST area for a short period of
18 time.  Their tasks vary from copying to other seated work – answering phone for
19 example.  Fahey Dep., pp. 36:15-37:21; 38:19-23; 39:2-18; 49:8-18; 74:15-75:9; 83:23-
20 84:1; 102:8-103:2.

21    25.    Dezham had little or no experience with computers and could not assist in
22 that role while in AST however, she did assist with answering the telephones, stapling,
23 paperwork and other non-computer office duties.  During her time in the AST office, she
24 did little or nothing with computers.  Fahey Dep., pp. 49:22-50:8; 57:2-58:10.

25    26.    Dezham was also asked to assist with duties on the selling floor two times
26 during her modified duty phase.  She was allowed to perform tasks that allowed her to sit

and thus comply with the restrictions imposed by her doctor. This was during the holiday season when many employees are asked to assist in this manner. Dezham Dep., p. 148:9-17; Fahey Dep., pp. 87:20-88:13; 95:3-96:14; 119:6-25.

27.    Dezham complained to Fahey about these duties because she liked working in AST better. That was her only complaint to Fahey about being asked to assist on the selling floor. Fahey Dep., pp. 89:23-90:11.

28.    Fahey had to consistently remind Dezham to honor her doctor's restrictions. He would remind her to sit to work when she tried to stand for instance. Fahey Dep., pp. 91:12-92:5.

29.    During Dezham's temporary assignment in the AST area, Macy's reviewed what accommodations could be made that would allow Dezham to go back to her sales job and meet her restrictions. The final conclusion was that Macy's would purchase a motorized scooter that would allow Dezham to sit for most of her shift and still perform her job duties. Fahey Dep., p. 41:2-9; Eagle Dep. pp. 40:16-41:21; 44:4-25; Sherman Dec. ¶14.

30.    Roberta Eagle in Human Resources and Jonelle Eversman in the Return to Work department reviewed the doctor's restrictions and determined that purchasing a scooter would allow Dezham to return to her permanent position and perform her job duties while still meeting her restrictions. Eagle Dep., pp. 83:19-84:15; 85:12-86:11; 101:9-21; 105:10-19, Eagle Dec., ¶13.

31.    At the end of her 90 days of modified duty, Dezham's restrictions were that she could not lift or push/pull more than 10 pounds, she could not stand or walk more than 20 minutes per hour but she could work an 8 hour shift. She could not climb or walk on uneven surfaces. Eagle Dec., ¶13, and Exhibit E.

32.    The scooter cost approximately $1,000 and was purchased by Macy's specifically to assist Dezham in her return to work. Dezham Dep., p. 157:2-23; Sherman

1   Dec., ¶15.

2      33.      Shawn Fahey taught Dezham how to ride the scooter and she had a special

3   key chain for it.  Dezham Dep., pp. 157: 24-158:13.

4      34.      Dezham was in the AST modified duty position slightly longer than 90 days

5   as the scooter was not on premises at exactly 90 days.  Macy's left Dezham on modified

6   duty until the scooter arrived.  Dezham was placed back on the floor in January 2011

7   with her scooter.  Dezham Dep., pp. 152:18-24, 157:24-158:1; Eagle Dep., pp. 44:16-

8   45:15; 71:13-72:2.

9   **The Scooter Accommodation**

10      35      The only issue Dezham complained about was one time Judy Wilson asked

11   her to move her scooter.  Dezham and Wilson differ on the conversation leading to the

12   move, but Dezham admits that Wilson moved fixtures to make room for the scooter so

13   that it was safe for others passing by but also available to Dezham to use.  Dezham Dep.,

14   pp. 159:15-160:25; Wilson Dep., pp. 17:23-19:4; 21:9-22:10; 30:3-32:5.

15      36.      Although Dezham claims she had a problem making her sales goals because

16   of the scooter, she testified that she believes she made her sales goals.  Dezham Dep., p.

17   161:1-20; Eagle Dep., p. 176:19-23.

18      37.      Dezham admits she was able to honor the restrictions imposed by her

19   physician while working with the scooter.  Dezham Dep., p. 163:8-14.

20      38.      Dezham performed her job duties while using the scooter for approximately

21   five months.  On May 27, 2011, her physician placed her back on a leave of absence

22   because she was still having some pain.  Dezham Dep., p. 167:4-19; Eagle Dep., pp.

23   47:18-48:7.

24      39.      Macy's agreed to the leave of absence.  Dezham Dep., pp. 171:20-172:3.

25   **Second Leave**

26      40.      After she left on a leave of absence in May 2011, Macy's granted several

27

requests to extend the leave of absence until January 2012. Macy's terminated Dezham's employment in January 2012 because her physician stated that she required a leave of absence for an "indefinite" period of time. Dezham Dep., pp. 173:2-174:7; Eagle Dep., p. 106:2-18; Sherman Dec., ¶16.

41.     On or about January 16, 2012, Macy's sent Dezham a letter stating that, because Macy's could not grant her request for an indefinite leave of absence, her employment would be terminated. Dezham was officially off-rolled by Macy's on January 25, 2012. Dezham Dep., pp. 174:8:175:11 and Exhibit 6 attached thereto; Eagle Dep., p. 53:19-23, Eagle Dec., ¶15, and Ex. F and G; Sherman Dec., ¶16.

42.     The formal reason for Dezham's termination is her failure to return from a leave of absence, i.e. being on an indefinite leave. Eagle Dep., pp. 28:7-16; 53:19-23, Sherman Dec., ¶16.

43.     Dezham's signature is on the doctor's correspondence stating that her leave of absence is indefinite. Specifically, Dezham's doctor checked the box that stated: "No, I am unable to give a return date in the reasonably foreseeable future as the leave is indefinite." Dezham Dep., pp. 177:12-180:21, and Exhibit 7 attached thereto.

44.     Macy's policy and practice at that time was to not grant indefinite leaves of absence. However, the termination letter made clear that Dezham was free to re-apply for work at Macy's when her circumstances allowed. This did not mean that Dezham would be given special consideration in the hiring process, but that she would be treated like any other new hire candidate. Sherman Dec., ¶6-7.

45.     Dezham admits that she did not believe she was off-rolled because of her race, national origin, religion or age. Dezham believes the reason she was off-rolled is because she was disabled at the time and could not come back to work and no other reason. Dezham Dep., pp. 182:8-183:4; 183:5-15.

46.     Judy Wilson had nothing to do with the termination of Dezham's

employment.  Wilson Dep., pp. 13:24-14:5; 35:24-36:12.

**Return to Work**

47.    Dezham testified that, after she was off-rolled by Macy's, there was no point in time when she was able to work.  However, she also testified that her doctor released her in March 2013 because her lawyer told her to have the doctor release her. The doctor's note releasing her to work as of March 13, 2013 was actually dated September 9, 2013. Dezham also testified that her doctor told her at that time that she could not go back to her regular job because she cannot stand.  According to Dezham's testimony, she was only released to work at that time because she asked her doctor to give her a release to work at her attorney's instruction. Dezham Dep., pp. 186:2-17; 186:24-189:1; and Exhibit 7 attached thereto; 214:16-215:9.

48.    Dezham applied to work at the Macy's store in Laguna Hills sometime between May and July 2013.  She received an email notice from stating that the store did not have any openings at that time.  There is no evidence that the failure to hire Dezham at the Laguna Hills store had anything to do with Dezham's protected characteristics or that anyone at that store even knew who she was.  Dezham Dep., pp. 190:18-191:13; 192:15-193:21.

49.    Dezham does not believe her failure to obtain an interview at the Laguna Hills store had anything to do with her race, national origin, religion or age.  She does, however, believe it was because of her disability.  Her belief that the failure to interview her was related to her disability is solely based on her unsupported belief that the person sending the email had her "information."  Dezham admits that she does not know whether anyone at Macy's Laguna Hills knew she had a disability.  Dezham Dep., pp. 193:22-195:10.

50.    All application vetting is done by the Employment Support Center in Clearwater, Florida.  The system used for Macy's applications is Taleo.  An employee in

Florida reviews each application. The person reviewing the applications will consider the qualifications required for the position, the qualifications of the candidate, the pay rate requested versus the pay rate allowed for the position in question, the applicant's response to the various questions on the application and a myriad of other factors. The person located in Florida would not have any reason to know – in this case for example – that Ms. Dezham was a Muslim, over 40, Iranian or that she had a disability. The only thing the Florida reviewer will know is what is on the application itself. Declaration of Denice Flynn ("Flynn Dec."), ¶4.

51.    Dezham also applied for a sales position at the South Coast Plaza home store sometime between May and July 2013. There are two Macy's stores at South Coast Plaza; each has a separate store number and does it own hiring. Dezham Dep., pp. 195:20-196:9; Deposition of Susan Graham ("Graham Dep."), p. 51:3-9; Villella Dep., pp. 42:1-25; 45:10-46:7; 70:15-22.

52.    Dezham received an email asking her to schedule an interview – which she did. Dezham Dep., p. 196:10-24.

53.    During her interview, Dezham met with Elizabeth Villela. Although the interview went well, Dezham was not hired because there were no positions open at the time. There had been openings but when Ms. Villela checked the job board after speaking to Dezham, she saw that the openings had all been filled. Villela informed Dezham that she would "bench" her application for future consideration. Dezham Dep., pp. 197:22-200:11; Villela Dep., pp. 46:8-48:1; 64:13-65:25; 66:15-67:11; 72:10-19.

54.    Benched applications were put in a file in the store where they would be available to any managers who were seeking to fill an opening. The decision as to whether or not to use a benched application is up to the hiring manager. There is no hard and fast rule that a hiring manager must refer to or consider the benched applications. Fahey Dep., p. 82:4-9; Eagle Dep., pp. 153:14-23; 157:8-13; 162:19-163:5; Flynn Dec.

---

DEFENDANT MACY'S WEST STORES, INC.'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

11

¶5; Villela Dep., pp. 50:21-51:6; 182:16-183:2; 198:7-199:4; 202:3-21.

55.     During her interview with Villela, Dezham stated that she needed a seated position and wanted to be in AST. Villela then texted the head of the AST group, Shawn Fahey, to inquire whether there were any openings for AST positions at the South Coast Plaza store. Fahey replied that there were no open positions in AST. Villela conveyed this to Dezham as well. Villela also suggested that Dezham apply for the other Macy's store in the South Coast Plaza, which might have more options for her than the Home Store. Dezham Dep., pp. 200:12-201:20; Fahey Dep., pp. 55:10-56:20; Villela Dep., pp. 49:17-50:20; 51:15-53:25; 57:14-58:6; 108:18-110:8; 184:1-7.

56.     Dezham does not have any information to disprove Villela's representation that there were no open positions at that time. Villela was not aware of Dezham's national origin or religion. Dezham Dep., pp. 202:7-203:12; Villela Dep., p. 159:2-6.

57.     Based on his experience working with Dezham while she was assigned to the AST group, the head of the AST group, Shawn Fahey, did not think that Dezham was qualified to work in AST. In particular, he noted her lack of computer skills, the fact that she had not worked in an administrative position before and she had none of the other skills in cash counting and so on. The AST position requires the employee to be fluent in Word and Excel. Fahey Dep., pp. 120:21-122:2.

58.     Of note, managers at Macy's are always interviewing – even if there is not an open position – because the turnover is such that there is either a need or an anticipated need. Fahey Dep., pp. 80:16-81:1; Graham Dep., pp. 25:9-26:7; Villela Dep., pp. 116:17-117:24.

59.     Each Macy's store hires for its own openings. A candidate seeking to work at different locations must indicate that on his or her application. Macy's system will not allow a candidate to have two separate applications pending at one time. Eagle Dep., pp. 19:10-20:14.

60.    At Macy's, when there are openings, the preference is to hire from within.  If there are no internal candidates, the company will then consider current applications.  After that, if the current applications are not sufficient in number or quality, then the company may consider benched applications.  The manager could also consider benched candidates before interviewing any new candidates.  There is also nothing to prevent benched candidates from re-applying.   Graham Dep., pp. 30:4-31:12; Villela Dep., pp. 50:21-51:6; 182:16-183:2; 198:7-199:4; 202:3-21; Flynn Dec., ¶5.

61.    Dezham did not ever re-apply at Macy's again.  Dezham Dep., p. 203:13-16.

**Nationality/Race**

62.    Dezham is a Persian from Iran.  She identifies her race as white.  Dezham Dep., p. 91:6-17.

63.    The only comment Dezham recalled that was arguably related to her Iranian extraction was a comment by Judy Wilson who once confided in Dezham that she had Iranian neighbors who were too noisy and she was thinking of calling the police about their conduct.  Wilson also noted during the same conversation that with so many people coming from other countries, she now had to lock her doors when she previously had not.  This comment was made before 2010.  Dezham Dep., pp. 62:5-64:9; 65:22-66:9;68:23-69:24; 73:19-77:19; 92:21-93:25; Wilson Dep., pp. 43:25-47:7.

64.    No one ever made any other comments to her about being a Persian or being from Iran.  Dezham Dep., pp. 103:18-104:17.

65.    Dezham did not report the comments that were said to her by Wilson.  Dezham Dep., pp. 71:18-73:9; 87:8-13.

66.    Dezham never reported to anyone in management that she felt she was discriminated against because of her national origin or race.  Dezham Dep., pp. 71:5-73:9; 165:2-5; Eagle Dep., pp. 23:24-24:15.

**Age**

67.   Dezham was born on March 29, 1957.  Dezham Dep., pp. 12:20-21; 91:6-17.

68.   Dezham stated that one time when asking to take vacation, Judy Wilson stated that since she (Dezham) was not married and old, that she should let the younger people take their vacation.  This comment was made before 2010.  Dezham Dep., pp. 100:22-103:11.

69.   Dezham admitted she got to take her vacation.  Dezham Dep., p. 103:16-17.

70.   Dezham never reported to anyone in management that she felt she was discriminated against because of her age.  Dezham Dep., p. 165:2-5; Eagle Dep., pp. 23:24-24:15.

71.   No one else at Macy's made any other comments about her age; Dezham simply deduced this without any factual support.  Dezham Dep. pp. 105:4-6; 145:20-146:9.

**Disability**

72.   Dezham stated that some of her co-workers (unidentified) and customers made comments about wanting a scooter like hers and saying things such as they would like not having to work and asking where she got the scooter.  Dezham Dep., pp. 163:15-165:1.

73.   The comments mentioned by Dezham in her deposition were not made by managers.  Dezham Dep., p. 161:9-11.

74.   Dezham never reported this conduct to anyone in management.  Dezham Dep., p. 165:2-10.

75.   Dezham never reported to anyone in management that she felt she was discriminated against because of her alleged disability/injury.   Dezham Dep., p. 165:2-5; Eagle Dep., pp. 23:24-24:15.

**Permanent AST Position**

76.     Dezham claims that while she was on modified duty in the AST group, she asked to become a permanent part of the AST team and was told there were no available openings. Dezham Dep., p. 141:16-25; Eagle Dep., pp. 86:24-87:21.

77.     Fahey did bring in new people while Dezham was a temporary. He had specifically asked one person, Elizabeth Villela, to join the team because of her performance in her other position. Fahey Dep., pp. 69:10-70:7; 97:2-11.

78.     Fahey does not believe that Dezham has the same qualities or qualifications as Elizabeth Villela to serve as a permanent AST employee. Fahey felt that based on what he knows about Dezham, she is not qualified to be an AST employee. Fahey Dep., pp. 70:8-19; 120:21-122:2; 123:23-124:7.

79.     All positions in Macy's are filled starting with the posting and application on Macysjobs.com. If approved as meeting the qualifications for the position, an interview is then scheduled. Fahey Dep., pp. 59:13-16; 60:20-61:23; 66:24-67:19; Graham Dep., pp. 24:3-25:8; Flynn Dec., ¶4.

80.     Dezham never applied for any AST positions on Macysjobs.com. In fact, Dezham admits that she did not complete an application because there were no openings. Dezham Dep., pp. 146:24-147:2; Fahey Dep., p. 56:8-10.

81.     Dezham admits that no one ever tied her not being placed in a permanent AST position to her age, her being Iranian or Muslim or because she had a disability. Dezham Dep., pp. 145:20-146:13-23.

**Charge and Lawsuit**

82.     Dezham's last day of work in a Macy's store was May 27, 2011. Dezham Dep at p. 48:6-8; 167:16-19.

83.     Dezham filed her first charge of discrimination with the DFEH on October 2, 2012. Flynn Dec. ¶9, and Ex. A.

84.    Dezham's right to sue notice is dated October 2, 2012. Flynn Dec. ¶10, and Ex. B.

85.    Dezham filed this action on October 17, 2013. Flynn Dec. ¶11.

**Miscellaneous**

86.    Dezham testified that she was required to meet sales goals while she was working in the AST office. There was no requirement that she meet sales goals while on modified duty. In fact, Dezham admitted herself that she was not given any type of written reprimand nor was she discharged for anything related to sales goals while on modified duty. When she mentioned the issue to Shawn Fahey who was in charge of the AST staff, he too told her not to worry. Dezham Dep., pp. 149:6-150:18; Eagle Dep., p. 34:11-13.

87.    Dezham did not have to meet sales goals while working in the AST office. Fahey Dep., p. 85:4-12; Eagle Dep., p. 34:11-13.

88.    Dezham complains that she was removed from her role as a Wacoal specialist. Her supervisor at the time in lingerie, Judy Wilson, notes that the specialist decision was driven solely based on numbers and Dezham and another employee, "Rosie", went back and forth as to who held the specialist title. Wilson did not make that decision. Wilson Dep., pp. 50:23-51:17; 66:23-25.

89.    Dezham received a check from Macy's in January 2012 when she was off rolled. She also received payments in November 2012 in the amount of $72 and $59. The checks in November were for the overpayment of benefits. Dezham Dep., pp. 219:11-220:13l; Eagle Dec. ¶16.

90.    Dezham was paid for 131 hours vacation time when her employment was terminated. Eagle Dep., pp. 64:6-66:1.

91.    A voucher was issued and available for Dezham at the South Coast Plaza

---

store as of January 28, 2012 but she never picked it up.  The voucher was converted to a check and mailed to her home.  Dezham received some refunds on benefit deductions as well after her employment ended.  Eagle Dec., ¶16.

**Utilization Review**

92.     Macy's Corporate Services, Inc. ("MCS") administers workers' compensation claims filed by employees of Macy's West Stores, Inc.  In administering that function, in order to determine whether certain treatment is medically necessary for an injured employee, MCS uses the utilization review ("UR") process as is required by law.  The UR vendor program that MCS uses is Genex.  Declaration of Ann Schnure, ¶ 4 ("Schnure Dec.").

93.     When a treating physician requests treatment that MCS is unsure is medically necessary, a utilization review request is sent to Genex along with the doctor's order for the treatment and the employee's diagnosis.  Genex reviews the treatment request and if the treatment appears to be outside of the ACOEM guidelines and not medically appropriate, a peer review is performed.  The doctor contracted by Genex – and not related to MCS in any way - then reviews the employee's diagnosis and the recommended treatment.  The doctor then decides whether to certify the treatment – meaning it will be given to the employee – or to not certify it – in which case the employee will not receive the treatment.  Schnure Dec., ¶5.

94.     MCS is required to accept the UR program's recommendation if it is in favor of the employee.  If the recommendation is not in the employee's favor, there is an appeal process that the employee can use. MCS can also decide to allow the treatment even if Genex recommends against it.  Schnure Dec., ¶5.

95.     MCS does not refuse treatment requested by a treating doctor for an injured employee without using the UR process.  Treatment is only denied if and when an independent UR doctor recommends the treatment not be given and the decision is

1  upheld on appeal (if the employee appeals).  Schnure Dec., ¶6.

2       96.    Genex sends a letter directly to the injured employee explaining whether the
3  treatment was certified or not and the reason behind the decision.  MCS is copied on the
4  letter.  Schnure Dec., ¶7.

5       97.    To the extent that Ms. Dezham was denied treatment as she is alleging in her
6  Amended Complaint, it was the decision of Genex and not MCS.  Schnure Dec., ¶8.

7       98.    MCS maintains the workers' compensation file of an injured employee in
8  the strictest of confidence as required by law.  Only persons at MCS working on the file
9  or their supervisors have access to the file.  No one in the employee's store (where she
10  was employed) is informed by MCS as to treatment sought by the employee or the status
11  of the employee's workers' compensation case.  The store personnel are not involved in
12  decisions about treatment of the injured employee or any other decisions related to the
13  workers' compensation case.  Schnure Dec., ¶9.

14       99.    Likewise, the MCS adjuster working the workers' compensation case knows
15  only what is going on with respect to the workers' compensation issue – the adjuster has
16  no knowledge of anything that happened at the store other than the events leading to the
17  employee's alleged injury.  Schnure Dec., ¶10.

18

19  Dated: November 14, 2014

20

21                                              SHIRLEY D. DEUTSCH
22                                              Attorneys for Defendants

23

24

25

26

27